**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
UNITED STATES OF AMERICA, * CRIMINAL NO. 1:16-cr-10318-RGS-1
     Plaintiff           *
                         * BOSTON, MASSACHUSETTS
          v.             * FEBRUARY 1, 2017
                         *
KURT SANBORN,            *
     Defendant           *
* * * * * * * * * * * * *
```

TRANSCRIPT OF DETENTION & PRELIMINARY REVOCATION HEARING
BEFORE THE HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      BY: Rachel Y. Hemani, AUSA
                      One Courthouse Way, Suite 9200
                      Boston, MA 02210
                      617-748-3510
                      rachel.hemani@usdoj.gov

For the Defendant:    Lauren M. Thomas, Esquire
                      Lauren Thomas Law
                      Suite 9
                      220 Commercial Street
                      Boston, MA 02109
                      617-997-7957
                      lthomas@lawlt.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                          **I N D E X**

2 **WITNESSES**              **DIRECT**   **CROSS**      **REDIRECT**    **RECROSS**

3 **Government's:**

4 PO LISA DUBE          4      21

5 **EXHIBITS DESCRIPTION**                      **MARKED** **IN EVIDENCE**

6 **Government's:**

7 1    Police Report from an alleged stalking

8       incident as to Kurt Sanborn and Mrs. P.  4      4

9 2    Collection of police reports from

10      Wayland PD detailing an incident as to

11      C.H. and Kurt Sanborn                    4      4

12 3    Flyer alleged to be distributed by

13      Kurt Sanborn as to Ms. C.H.              4      4

14 4    Restraining order from Dudley District

15      Court as to Kurt Sanborn                 4      4

16 **Defendant's:**

17 A    Motion for Discovery as to Kurt Sanborn 30      30

18      state case

19 B    Admission letter from UMass Lowell

20      as to Kurt Sanborn                       30     30

21 C    Screen shot from UMass Lowell's website

22      as to courses as to Kurt Sanborn         30     30

23 **ARGUMENT:**  Ms. Thomas                             30

24 **RESPONSE:**  Ms. Hemani                             34

25

3

1  COURT CALLED INTO SESSION

2  (2:49:21)

3          THE CLERK:  Today's February 1, 2017.  We're on

4  the record in the matter of United States v. Kurt Sanborn,

5  Case No. 16-CR-10318.

6          Could counsel please identify themselves for the

7  record?

8          MS. HEMANI:  Good afternoon, Your Honor.  Rachel

9  Hemani for the United States.

10          THE COURT:  Good afternoon.

11          MS. THOMAS:  Good afternoon.  Lauren Thomas on

12  behalf of Mr. Sanborn, who's present in the courtroom.

13          THE COURT:  Good afternoon.  So we're here for a

14  preliminary hearing and detention hearing for Mr. Sanborn.

15          Ms. Thomas, does your client wish to proceed with

16  the hearings?

17          MS. THOMAS:  Yes.

18          THE COURT:  All right.  Ms. Hemani, are you going

19  to call a witness?

20          MS. HEMANI:  Yeah.  The government calls Probation

21  Officer Lisa Dube.

22          THE COURT:  All right.  And I see you have

23  Exhibits 1-4.  Ms. Thomas, do you have a copy of those

24  exhibits?

25          MS. THOMAS:  I do, Your Honor.

4

1          THE COURT:  And do you have any objection to the

2  exhibits?

3          MS. THOMAS:  No.

4          THE COURT:  So Government Exhibits 1 through 4 are

5  admitted for purposes of this proceeding.

6      GOVERNMENT EXHIBIT NO. 1-4, MARKED & ADMITTED

7          THE COURT:  Do you want to go to the witness

8  stand?

9      PROBATION OFFICER LISA DUBE, GOVERNMENT WITNESS, SWORN

10         THE CLERK:  Would you state your full name for the

11  record and spell your last name?

12         THE WITNESS:  Lisa Dube, D-U-B-E.

13            THE CLERK:  You may be seated.

14                DIRECT EXAMINATION

15  BY MS. HEMANI:

16  Q.   Ms. Dube, could you please tell the Court what your

17  position is?

18  A.   I'm a senior probation officer with the Federal

19  Probation Office.

20  Q.   And what are your duties as a senior probation officer?

21  A.   I supervise higher risk cases, people that have been

22  released from custody and are now residing in the community.

23  Q.   And are you familiar with the defendant, Kurt Sanborn?

24  A.   Yes.

25  Q.   When did you personally first get involved in

5

1  supervising the defendant?

2  A.   In early July of 2016 his case was assigned to me.  He

3  hadn't been released yet, but I was doing some pre-release

4  planning.

5  Q.   And could you please tell the Court what the

6  conviction, the underlying conviction, was that led to his

7  being sentenced and ultimately being supervised by your

8  office?

9  A.   It was fraud.

10  Q.   And where was that case being prosecuted?

11  A.   In New Hampshire.

12  Q.   And have you reviewed the PSR that was prepared in

13  advance of his sentencing for that fraud case?

14  A.   Yes.

15  Q.   Do you recall approximately the loss amount that

16  probation determined in connection with that PSR?

17  A.   It was about $200,000.

18  Q.   Okay.  Have you also reviewed the defendant's criminal

19  history?

20  A.   Uh-huh.  Yes.

21  Q.   And in addition to that, the case out of New Hampshire,

22  does he have any other convictions?

23  A.   He has another federal case out of New Hampshire for

24  fraud, as well, with I think about the same amount.

25  Q.   Okay.

6

1 A.   And then another I think violation of a restraining

2 order conviction, as well.

3 Q.   Okay.  Thank you.  Backing up for a moment, you stated

4 that you personally began supervising the defendant shortly

5 before he was released from federal custody in July of last

6 year.

7      When did your office first become involved in

8 supervising the defendant approximately?  Was it before

9 that?

10 A.   Yes.

11 Q.   Okay.  And can you describe the circumstances in which

12 your office first became involved with supervising the

13 defendant?

14 A.   I believe that he was supervised on pre-trial status

15 for the District of New Hampshire in 2014.

16 Q.   Okay.  And were you personally involved in his

17 pre-trial supervision?

18 A.   No.

19 Q.   Did you learn whether or not the defendant abided by

20 his terms of pre-trial release while he was being supervised

21 by your office?

22 A.   Yes.

23 Q.   Did he abide by the terms of his pre-trial release?

24 A.   No.

25 Q.   Okay.  And in particular, are you aware of whether the

7

1  defendant was charged with stalking while he was on

2  pre-trial release?

3  A.    Yes.

4  Q.    Have you reviewed police reports relating to that

5  incident?

6  A.    Yes.

7  Q.    And did the alleged victim in that case have an active

8  restraining order against the defendant?

9  A.    I believe so.

10 Q.    All right.  Can you briefly describe the facts

11 surrounding those stalking charges?

12         MS. THOMAS:  Objection.

13         THE COURT:  What's the basis for the objection?

14         MS. THOMAS:  She didn't do any of the

15 investigation into the incident.  There are police reports

16 that I think speak on their own, and for her to simply

17 rehash what these exhibits are doesn't seem appropriate.

18         THE COURT:  All right.  So I mean, the rules of

19 evidence are loosely enforced in this proceeding, so I'll

20 allow her to testify.  But obviously if you think she's

21 mischaracterized or stated something incorrectly, you're

22 welcome to cross examine on that.

23 BY MS. HEMANI:

24 Q.    I'm just asking for a very brief description.

25 A.    So my recollection is that he broke into this woman who

8

1  had a restraining order's apartment, took some personal

2  information, and that was -- there was --

3       I believe that there was more than one incident, so

4  that's at least one of the incidents.

5  Q.   Okay.  And where -- in what state did this incident

6  take place?

7  A.   In Rhode Island.

8  Q.   Okay.  And are you familiar with --

9       You've reviewed the police report in this matter?

10 A.   I have.  I can't --

11 Q.   Okay.  That's okay.

12 A.   -- recall all the details, but yes.

13 Q.   And in front of you you have a documents that's marked

14 as Exhibit 1.

15 A.   Uh-Huh.

16 Q.   Can you describe what that -- just what is that

17 document?

18 A.   It's a police report from the alleged stalking slash

19 violation of restraining order.

20 Q.   This is the incident that you're describing that

21 occurred when he was on pre-trial supervision but when you

22 personally were not supervising him; is that correct?

23 A.   That's correct.

24 Q.   Okay.

25          MS. HEMANI:  And the Court has already admitted

9

1 that as Exhibit 1.

2      Now, was the defendant arrested on any other occasions

3 while he was on pre-trial release?

4 A.   Yes.

5 Q.   Can you describe --

6 A.   So I think December 24, I believe it was, also 2014 he

7 was arrested for a violation of his conditions.  He was on

8 home detention and fled and was found to be in Rhode Island,

9 I believe.

10 Q.   Okay.  And in addition to being on home detention, was

11 he on any type of electronic monitoring at the time?

12 A.   He had a bracelet.

13 Q.   Okay.  Now, in addition to those two instances in which

14 he was arrested, are you aware of -- and again, I know you

15 weren't personally supervising him -- any other violations

16 of his pre-trial release before you were involved in his

17 case?

18 A.   I think he had multiple violations of his electronic

19 monitoring, as well.

20 Q.   All right.  Now, you stated earlier that you began

21 supervising the defendant approximately July of 2016.

22      Since the defendant has been under supervised release,

23 have you come to learn that he has been involved in any type

24 of stalking-type incidents?

25 A.   Yes.

1 Q.   Okay.  And how many of such episodes have there been

2 between July of 2016 when you first began supervising him

3 and the present?  How many different victims is another way

4 of putting it.

5          MS. THOMAS:  Objection.  It's the characterization

6 of "victim."  He's not been charged with anything.  He's

7 been charged in one case, but I believe that the witness is

8 going to testify to other uncharged incidents that never

9 arose to anything.

10          THE COURT:  So why don't we use a different term

11 than "victim."

12          MS. HEMANI:  I would prefer not to use --

13          I mean, whether they are technically victims or

14 not victims, I'd like not to use their names in this

15 proceeding.

16          THE COURT:  Well, you can say Mrs. A. if you want

17 to or --

18          MS. HEMANI:  That's fine.

19          THE COURT:  Or Ms. A. or something.

20          MS. HEMANI:  That's fine.

21          THE COURT:  There are other terms you could use.

22 BY MS. HEMANI:

23 Q.   How many different individuals were involved?

24 A.   Three.

25 Q.   Okay.  Starting with the first one of these

1 individuals, how did that come to your attention?

2 A.   So on September 23 Mr. Sanborn notified me that he had

3 had law enforcement contact in the community in which Mrs.

4 P. resided, and that he had been on a first date.  There was

5 an altercation with her ex-husband, and the police were

6 there, and they questioned him.

7 Q.   Okay.  And did you come to learn whether the defendant

8 was having a relationship with Mrs. P.?

9 A.   Yes.  I subsequently obtained a copy of the police

10 report.  And I reached out to Mrs. P., and she indicated

11 that the relationship had been going on for, I think, four

12 to six weeks prior to that.

13 Q.   Now, you said you reached out to Mrs. P.

14     Can you explain for the Court why in your role as

15 probation officer you would reach out to somebody who is

16 having a relationship with this defendant?

17 A.   So one of the requirements that I have is a third party

18 risk notification requirement.  The conditions say that if

19 there's a risk occasioned by your history to a third party,

20 the probation office shall make notification to that person.

21     And based on the fact that he had a history of stalking

22 slash violating a restraining order, we viewed there as

23 being a third party risk notification requirement with any

24 intimate relationship.

25 Q.   Okay.  And when you spoke to Mrs. P., did you learn

1  what name the defendant was using with her?

2  A.   Yes.

3  Q.   And was it a surname?

4  A.   He was using the name of David Sanborn.

5  Q.   Now, can you describe what happened, what you learned

6  about what happened after you contacted Mrs. P.?

7  A.   So after I contacted her, shortly thereafter, I believe

8  she chose to end -- according to her, she chose to end the

9  relationship.

10 Q.   Okay.  And again, I understand based on what she told

11 you, but what did she tell you happened when she attempted

12 to end the relationship?

13 A.   That threats were made to her daughter to file criminal

14 charges, because her daughter had recorded a telephone

15 conversation involving Mrs. P. and Mr. Sanborn, so her

16 fourteen-year-old daughter.

17     And also a letter that she -- a letter was written to

18 her ex-husband who she was in the process of divorcing

19 alleging that she wasn't a suitable mother.

20 Q.   Okay.  And okay.  So what happened next?

21     You learned that Mrs. P. told you that she attempted to

22 break off the relationship, and did you learn that the

23 defendant did anything in response?

24 A.   So Mr. Sanborn reached out to me and said he was being

25 stalked by Mrs. P., and that I think he obtained a

13

1  restraining order against her.

2  Q.   And did you learn what happened with that restraining

3  order?

4  A.   The Court did not extend the restraining order.

5  Q.   So moving on to the second individual.  You mentioned

6  there were three individuals.

7       How did you come to learn about that second individual?

8  A.   So the second individual I learned about because we

9  received notification that Mr. Sanborn's record had been run

10 by a police department, and when I reached out, I learned

11 that a restraining order had been filed by this individual

12 related to some stalking incidents that occurred.

13 Q.   Okay.  And did you obtain police reports?

14 A.   Yes.

15 Q.   And you reviewed those police reports?

16 A.   Yes.

17 Q.   Did you also speak to this individual --

18 A.   Actually --

19 Q.   -- with the initials C.H.?

20 A.   Yes, I met with C.H.

21 Q.   Okay.  And what name did the defendant use with C.H.?

22 A.   David Sanborn.

23 Q.   Okay.  And how did they meet?

24 A.   Match.com.

25 Q.   Okay.  And in the course of your supervising the

14

1 defendant -- and we'll come to this point again, but did you

2 ask him to tell you whether he was in a relationship?

3 A.   Multiple times.

4 Q.   Okay.  And during this time period that you learned

5 that he was involved in a relationship with C.H., did he

6 tell you whether he was in a relationship?

7 A.   No.

8 Q.   He denied being in a relationship?

9 A.   Right.

10 Q.   Okay.  Now, did C.H. eventually come to learn the

11 defendant's true identity?

12 A.   Yes.

13 Q.   Okay.  And how did that come about?

14 A.   Once she filed the restraining order and I reached out

15 to her, she learned what his true name was.

16 Q.   All right.  And can you please --

17     Again, Exhibit 2 which is also in front of you and has

18 been admitted into evidence is a collection of police

19 reports describing this incident.

20     Have you reviewed these had reports?

21 A.   Yes.

22 Q.   Okay.  And again, just very generally, can you describe

23 for the Court the conduct that led to the criminal charges

24 against the defendant, the stalking conduct?

25 A.   I believe that when C.H. broke up with Mr. Sanborn,

1 they alleged that she was being followed by him, that he was

2 excessively texting her, and she felt afraid and contacted

3 the police and got the restraining order.

4 Q.   Okay.  And what happened after she took the restraining

5 order out?

6       What did the defendant --

7       What is he alleged to have done after the restraining

8 order?

9 A.   Distribute defamatory flyers around the community.

10 Q.   Okay.  And specifically, where were these flyers

11 distributed?

12 A.   Around --

13       So this individual was a principal, and they were

14 distributed around the soccer field and mailed to the

15 schools in her school district.

16 Q.   And you have in front of you Exhibit 3 which has been

17 admitted as evidence, and in the course of your supervision

18 of Mr. Sanborn and your investigation of this violation, did

19 you obtain a copy of this flyer?

20 A.   Yes.

21 Q.   And is this the flyer that's alleged to have been

22 distributed around the school and around the town in which

23 this woman was a principal of an elementary school?

24 A.   Yes.

25 Q.   Okay.  Thank you.

1    Now, in connection with their investigation of the

2  stalking incident, did the police come to learn that the

3  defendant had submitted falsified evidence to Marlborough

4  District Court?

5  A.   Yes.

6  Q.   And what was the falsified evidence?

7  A.   The falsified evidence was a letter from his employer

8  stating that he was working on the evening of the alleged

9  stalking incidents.

10  Q.   And were there images from the surveillance --

11  A.   Yes.

12  Q.   -- footage also included?

13  A.   Yes.

14  Q.   And that the time on the surveillance footage purported

15  to be in the evening; is that correct?

16  A.   Right.

17  Q.   And what did police come to learn about when, if at

18  all, the defendant was working on that particular day?

19  A.   He'd worked in the morning, and the a.m. had been

20  changed to p.m.

21  Q.   Thank you.

22    Are you familiar with the evidence that the police

23  developed to show that it was actually the defendant who

24  distributed these flyers?

25  A.   Yes.

1  Q.   And very briefly, what --

2  A.   They obtained a subpoena is, a warrant for his phone

3  records, and were able to match up his location with his

4  phone with the location and time period that the flyers were

5  distributed.

6  Q.   Now, approximately --

7       These incidents, the stalking incidents involving C.H.,

8  approximately when did those take place?  What month?

9  A.   November.

10 Q.   November of 2016.  Okay.

11      So moving forward, what is, sort of, the next step in

12 terms of your supervision of the defendant?

13      What happened next?

14 A.   So we sought to have a meeting with him prior to

15 Thanksgiving.  And he became very upset, and his mother

16 wrote a letter to our office asking that it be delayed as

17 well as his attorney, so we didn't meet with him until

18 December 6.

19      At which time we discussed the allegations, and he

20 admitted to several of the allegations including traveling

21 out of state without permission, not being truthful about

22 his relationships and things of that nature.

23      And at that point he signed an agreement to some

24 modifications to his conditions.

25 Q.   And what were those modifications?

18

1  A.   That he was going to have a curfew with a bracelet,

2  that he was going to allow for computer monitoring of his

3  computer slash phone, that he was to inform probation

4  immediately of any relationships that he was in.

5       I'm not sure if there were any others.  Those are the

6  ones that I remember.

7  Q.   And that was on December 6th of 2016; is that correct?

8       Okay.  And now, you mentioned earlier that there were

9  three individuals that you came to learn had stalking or

10 threatening-type behavior.

11      When did you learn about the third individual?

12 A.   So I received a random phone call on January 10 from

13 C.B. --

14 Q.   Okay.

15 A.   -- informing me that she had just taken a restraining

16 order out.  And I was hesitant to speak with her, because I

17 didn't know who she was, but then she provided the

18 background of how she came to obtain my contact information

19 through C.H. and then gave me the details of what happened

20 with her.

21 Q.   How did she come to contact C.H., the second individual

22 you mentioned?

23 A.   She had had an incident with Mr. Sanborn in which she

24 felt threatened.  Statements were made about her husband or

25 family member having an accident, having something happen to

1 them that could be made to appear as an accident, and she

2 became frightened and started looking into him further, and

3 thought that his --

4      So he had used the name David Sanborn with a different

5 spelling with her, but somehow she connected him with a case

6 that she saw and went to Framingham District Court and

7 reviewed those documents and reached out to C.H.  So that's

8 how she came to know his true identity.

9 Q.   And then she subsequently contacted you?

10 A.   Right.

11 Q.   Did she tell you approximately when she started dating

12 the defendant?

13 A.   Early November.

14 Q.   Early November.

15      So before this meeting that you had, the sort of

16 come-clean meeting to modify conditions in December; is that

17 correct?

18 A.   Oh, excuse me.  Yes, I still think it was early

19 November; but yes, it was before our December 6 meeting.

20 Q.   Okay.  And did he notify you on December 6 or any other

21 time that he was in this new relationship?

22 A.   No.  And we specifically asked.

23 Q.   Okay.  And how did he meet this third individual?

24 A.   On Match.com.

25 Q.   Okay.  Now, specifically did you learn that he

1 threatened to file some type of report with the Department

2 of Family Services in connection with that third individual?

3 A.   I don't recall.

4 Q.   And you said earlier that C.B. notified you that the

5 defendant had sort of threatened her that he knew people who

6 could harm her husband and make it look like an accident.

7 A.   Right.

8 Q.   Now, I want to briefly such on some of the other

9 violations.

10     Traveling out of state.  You stated that in a December

11 6 meeting the defendant admitted that he traveled out of

12 state.

13 A.   Yes.

14 Q.   On how many occasions?

15 A.   He admitted to traveling out of state in November.

16 Q.   Okay.  And where did he travel?

17 A.   New York City.

18 Q.   And did you come to learn that he traveled out of state

19 on another occasion?

20 A.   Yes, to Rhode Island.

21 Q.   And who was he with on the trip to Rhode Island?

22 A.   He was with C.B., the third.

23 Q.   And the New York trip who was he with?

24 A.   C.H.

25 Q.   And during the course of your supervision has the

21

1  defendant been truthful about his current job status?

2  A.    No.

3  Q.    Okay.  And can you describe that?

4  A.    He was asked if he was employed on multiple occasions.

5  He indicated that he wasn't.  At one point it turned out

6  that he had been employed at Home Depot for a lot of that

7  period, and then he reported employment at Dunkin' Donuts

8  after he started the position.

9  Q.    Okay.  And the defendant --

10        We discussed that the defendant filed a motion earlier

11  today in which defense counsel asserts that he has a job at

12  UPS.

13        Has the defendant ever informed the probation office

14  that he is employed at UPS?

15  A.    So he had a job a UPS before Christmas doing -- helping

16  with package delivery.  He denied any employment after

17  Christmas.

18  Q.    Okay.  And did you learn --

19        Did he say anything to C.B. about working at UPS or

20  having a brown suit?

21  A.    He said he had a UPS uniform, and he could basically

22  get into anybody's house because of it.

23            MS. HEMANI:  No further questions.

24            THE COURT:  Ms. Thomas?

25                   CROSS-EXAMINATION

22

1  BY MS. THOMAS:

2  Q.   Ms. Dube, you're aware that Mr. Sanborn's middle name

3  is David; correct?

4  A.   Yes.

5  Q.   And that he does go by David.

6  A.   That's not what I refer to him as.  He's on the record

7  as being Kurt.

8  Q.   However, sometimes people do go by their middle names;

9  correct?

10 A.   I guess that's possible.

11 Q.   I want to go back and talk about these three women that

12 we've been discussing.

13      Now, Mrs. P. who I believe is the first one from back

14 in September of 2016, and in that -- with respect to her,

15 Mr. Sanborn did reach out to let you know that he had had

16 law enforcement contact with relation to her; correct?

17 A.   Yes.

18 Q.   And when you first spoke with Mrs. P., she had not made

19 any allegations that Mr. Sanborn had in any way physically

20 hurt her.

21 A.   No.

22 Q.   And until you reached out to her, she didn't know that

23 he was on federal probation.

24 A.   She had asked him, and he said that that was his

25 brother.

23

1  Q.   So she didn't know that he was on federal probation.

2  A.   No.

3  Q.   There's no criminal charges that are related to any of

4  his interactions with her.

5  A.   No.

6  Q.   And after that relationship came to an end, you talked

7  about a threatening -- some threats that it's allege that

8  Mr. Sanborn made; but in fact, those threats were not to

9  physically harm her; correct?

10  A.   No.

11  Q.   And in fact, he was able to obtain a restraining order

12  against her; correct?

13  A.   Correct.

14  Q.   The second woman that you referred to as C.H., that's

15  the one where there are open pending charges in the

16  Framingham District Court; correct?

17  A.   Right.

18  Q.   And in the entire investigation that was done --

19      In fact, Exhibit 2 describes that investigation, and

20  Exhibit 2's a 16-page police report; correct?

21  A.   Yes.

22  Q.   And the police department went and investigated over

23  the course of a few days; correct?

24  A.   Yes.

25  Q.   Pulling videos, speaking to other potential witnesses?

24

1  A.   Yes.

2  Q.   Not a single person that the police spoke to ever saw

3  Mr. Sanborn put these flyers out, did they?

4  A.   No.

5  Q.   There's no video of him doing so.

6  A.   There's a video of a car that matched the description

7  of the car that he was driving.

8  Q.   There's no video in which you see Mr. Sanborn putting

9  these flyers out; correct?

10  A.   Correct.

11  Q.   And from the police report it doesn't appear as though

12  the police made any inquiries into parents of students of

13  the school?

14  A.   I'm not sure about that.

15  Q.   Are you aware of whether or not the police even

16  investigated whether there were any disgruntled parents at

17  the school?

18  A.   I'm not aware of that.

19  Q.   And in fact, this activity where Mr. Sanborn is alleged

20  to have been following C.H., that's over the course of two

21  hours.

22  A.   I think so.  I'd have to look at the police report to

23  refresh my memory.

24  Q.   And it's not alleged that he followed her on any other

25  occasion; correct?

25

1  A.    I don't think so.

2  Q.    So the only allegation of this following her, of what

3  you have called stalking behavior, is over the course of a

4  two-hour period on one particular evening.

5  A.    I think that's correct.

6  Q.    Now, you did some --

7        Ms. C.H. does not allege that Mr. Sanborn in any way

8  was physically violent with her; correct?

9  A.    No.

10  Q.    Never put his hands on her?

11  A.    No.

12  Q.    And you're not an expert in determining whether a video

13  has been falsified; correct?

14  A.    Correct.

15  Q.    You're not an expert in how cell phone towers and

16  pinging work; correct?

17  A.    Correct.

18  Q.    And in fact, you haven't done any investigation at all

19  with respect to that incident aside from reading over the

20  police report and speaking to C.H.

21  A.    Incorrect.

22  Q.    What else have you done?

23  A.    I spoke with his boss at Dunkin' Donuts who informed me

24  that he had not worked that evening.

25  Q.    Now, all of those incidents happened before this

26

1  meeting on December 6, 2016, with Mr. Sanborn?

2  A.   Right.

3  Q.   And during that December 6 meeting when you discussed

4  new conditions with Mr. Sanborn, he agreed to have a GPS

5  monitor on his -- a bracelet; correct?

6  A.   A bracelet.  But for us it's not the same thing.  So

7  it's an electronic monitoring bracelet.  That's not a GPS

8  monitor.

9  Q.   But he agreed to the electronic monitoring device.

10 A.   Yes.

11 Q.   And your department didn't put that on him, did they?

12 A.   No.  He requested to not have it put on until after the

13 holidays.

14 Q.   And you agreed?

15 A.   We agreed.

16 Q.   He also agreed to have computer monitoring on all of

17 his devices; correct?

18 A.   Yes.

19 Q.   And your office did not put any electronic monitoring

20 on his computer?

21 A.   We were waiting.  The Court --

22      So the process of requesting those modifications, we

23 can't just say here are the modifications, and they take

24 effect.  The Court has to approve them.  And we hadn't heard

25 back from the Court yet.

27

1 Q.   However, Mr. Sanborn agreed to have them put on his

2 computer.

3 A.   Right.  But we can't do anything without the Court's

4 approval.

5 Q.   And you didn't do it?

6 A.   Correct.

7 Q.   He agreed to have it on his cell phone; correct?

8 A.   Correct.

9 Q.   And you didn't do that?

10 A.   Again, I can't do something that the Court doesn't

11 order me to do.

12 Q.   But you didn't?

13 A.   Correct.

14 Q.   Getting to the third individual that you discussed

15 that, I believe, you said January 10th of 2017 is when that

16 person contacted you.

17 A.   Yes.

18 Q.   And that person never alleged that Mr. Sanborn hit her.

19 A.   No.

20 Q.   That he in any way hurt her.

21 A.   No.

22 Q.   Physically.  Mr. Sanborn has never been charged with

23 falsifying evidence; correct?

24 A.   Correct.

25 Q.   And he has not been charged with any acts of violence

1 in terms of physical violence towards any of these women

2 that you've discussed.

3 A.    No.

4 Q.    In fact, he's never been charged with any acts of

5 violence towards any female that he's ever been in contact

6 with; correct?

7 A.    Depends whether you consider restraining orders.

8 Q.    Physical violence.

9 A.    Like I said, it depends whether you consider the

10 restraining orders.

11 Q.    So are you telling me that in one of those restraining

12 orders it's alleged that he hit someone?

13 A.    Yes.

14 Q.    And is that in here?

15 A.    No that's in the (inaudible) report.

16 Q.    You would agree that for an individual who is getting

17 out of a incarcerated status, that having employment would

18 be a positive thing in society; correct?

19 A.    Absolutely.

20 Q.    And Mr. Sanborn has been able to get and maintain a

21 number of different types of employment.

22 A.    It's hard to know, because he didn't share it with me.

23 Q.    You did verify that he worked at Dunkin' Donuts.

24 A.    That's -- yes.

25 Q.    You verified that he worked at UPS?

1 A.   No.

2 Q.   You're claiming that he never worked at UPS?

3 A.   I didn't verify it.  He told me someone was going to

4 call me, and the person never did.

5 Q.   If Mr. Sanborn were employed in the future, that would

6 also be a positive step towards his reintegration in

7 society?

8 A.   Right.

9 Q.   If Mr. Sanborn were able to get himself enrolled in

10 classes and start taking courses, that would also --

11          THE COURT:  Now, Ms. Thomas, this seems more like

12 argument.  Do you have any factual questions for the

13 witness?

14          MS. THOMAS:  Nothing more at this time.

15          THE COURT:  Anything further?

16          MS. HEMANI:  No.

17          THE COURT:  All right.  Thank you, Ms. Dube.  You

18 may step down.

19          Ms. Hemani, do you have any other witnesses or

20 other evidence?

21          MS. HEMANI:  No, just argument.

22          THE COURT:  Ms. Thomas, do you have any other --

23 do you have any witnesses, or do you have any other

24 evidence?

25          MS. THOMAS:  I do not have any witnesses.  There

30

1  were three exhibits that I filed with my memoranda.  I

2  haven't had an opportunity to ask the government whether

3  they have any objection to those, but I would be moving to

4  enter those in.

5           MS. HEMANI:  I don't have them printed out.  I

6  don't think I have on objection to them.

7           MS. THOMAS:  You're welcome to look at my copy.

8           THE COURT:  All right.  So I will admit those as

9  defendant's A. B and --

10          Were there three?

11          MS. THOMAS:  Yes.

12          THE COURT:  Three?  Okay.  So Defendants A, B, and

13  C.

14     DEFENDANT EXHIBIT NO. A, B, C MARKED & ADMITTED

15          THE COURT:  And Ms. Thomas, are you contesting

16  probable cause?

17          MS. THOMAS:  No.

18          THE COURT:  All right.  So it's the defendant's

19  burden of proof with respect to detention, so I'll hear from

20  you first, Ms. Thomas.

21     ARGUMENT FOR THE DEFENDANT

22          MS. THOMAS:  Your Honor, with respect to holding

23  Mr. Sanborn and detaining him puts him in a position where

24  if I --

25          I argue that he should -- that the violation would

1  be under violation B as opposed to a violation A, which was

2  the calculations.

3          But either way, we are looking at a period of

4  time.  At the most, it would be 24 months.

5          And I have included one of the motions that's

6  already pending in the Framingham District Court.  And Your

7  Honor can see that there's an extensive amount of discovery

8  that is going to be involved in that case, which I don't

9  have yet, quite frankly --

10          THE COURT:  So I know Judge Stearns hasn't

11  requested a final hearing, and that he I think --

12          I could be wrong.  I think it's his practice that

13  he likes to wait.  Ms. Dube may know better than I.  But

14  wait until the state or local charges are resolved.

15          But why couldn't you ask him for a hearing sooner

16  than that?

17          MS. THOMAS:  I can -- I can ask him for a hearing.

18          However, I think that the discovery in that case

19  would be helpful for me in terms of addressing any sort of

20  potential violations.  The more information that I have with

21  respect to the allegations, the better I'll be able to

22  present the case.

23          So it leaves Mr. Sanborn in a position where it's

24  likely that he'd be held for an extended period of time

25  waiting for the state case to run its course.  Mr. Sanborn

1  has made strong efforts to get employment, to get enrolled

2  in classes.  I provided proof that he was admitted into

3  University of Massachusetts Lowell, and not only is there

4  proof of admission, but there's also a screen shot that

5  shows that he's actually enrolled in classes as well.

6          THE COURT:  And is the enrollment still valid now

7  that he's already missed the first month of classes?

8          MS. THOMAS:  That's something that he's going to

9  have to address, ideally when he leaves here, and he might

10 need to speak directly to the professors to see if he can

11 make it up or maybe potentially have a short deferment, but.

12 That's something that he's going to have to work with the

13 admissions staff on himself.  I'm not really sure what their

14 position would be.

15         But as I understand, this is just about detention.

16 But Mr. Sanborn is willing to agree to pretty much any

17 condition that the Court would want in order to ensure any

18 concerns that the probation department has are addressed.

19 He's willing to be monitored.  He's willing to check in.

20 He's willing to have whatever they want done in order to

21 make sure that they're comfortable that he's being safe in

22 society.

23         THE COURT:  So if I look at your proposed

24 conditions of release, Ms. Thomas, it looks to be very

25 similar to what Ms. Dube just testified to that was agreed

1  upon before.  And if I understand the testimony correctly,

2  it was agreed to at the December 6 meeting, and then he's

3  accused of committing additional violations after that

4  meeting.

5          MS. THOMAS:  Well, December 6 was the meeting, and

6  although the third woman reached out on January 10 to the

7  probation department, she predates that agreement.  Contact

8  that he had with her and meeting her through Match, all of

9  that predates this December 6 meeting.

10          And so I understand what the Court is saying here

11  is that, well, you know, he had a chance, but it turns out

12  he wasn't following through.  He actually -- they hadn't had

13  a chance to get all of these new monitoring devices up and

14  going, and so it's -- he hasn't really had an opportunity to

15  comply with those agreed-upon conditions from the December 6

16  meeting.

17          THE COURT:  Anything else?

18          MS. THOMAS:  And Mr. Sanborn also is engaged in

19  psychological therapy.  I think that would be helpful for

20  him to continue with the same therapist.  He has a very good

21  working relationship with Dr. Cusack.  He has -- I've

22  personally spoken with Dr. Cusack, as well, and to address

23  some of the underlying issues that he's been dealing with.

24  He did suffer abuse when he was incarcerated, and so he's

25  working through the emotional scarring with Dr. Cusack.

34

1          So given the allegations from his prior

2  incarceration, it puts this incarceration time in a little

3  different light for him as a person, because they have to --

4          They keep him separated.  He's in a separate cell.

5  He doesn't have the same type of contact with other

6  individuals, and so it's a really -- it's a rough

7  incarceration, more so than just your run of the mill

8  incarceration.

9          Which is why I would ask that Your Honor consider

10  allowing him to stay at liberty under whatever conditions,

11  so that he can continue to put himself into a position to be

12  successful.

13          THE COURT:  Thank you.

14      RESPONSE FOR THE GOVERNMENT

15          MS. HEMANI:  Your Honor, very briefly, as you

16  already stated, the defendant has the burden of showing by

17  clear and convincing evidence that he is not a danger to the

18  community and that he is not a risk of flight.  And simply

19  put, the defendant has not met his burden here.

20          I think that the record shows that probation gave

21  him numerous chances to comply with his conditions.  He

22  failed to comply with conditions numerous occasions when he

23  was on pre-trial release and being supervised out of the

24  District of Massachusetts.  He has continuously violated

25  conditions since he was released in July of last year.

1          And while I don't take issue with defense
2  counsel's characterization that in these three incidents
3  he's not alleged to have physically harmed anyone, I think
4  the conduct is dangerous.

5          Taking Victim No. 2.  She tried to break up with
6  him.  I believe the reports say that he texted her something
7  like 83 times that night.  The next day she leaves work.
8  She's an elementary school principal, and she drives to a
9  restaurant where she's eating dinner and having a glass of
10  wine.  And while she's at dinner, she continues to receive
11  texts from him saying, "I should be there enjoying that
12  glass of wine with you."  And then she proceeds to go from
13  that restaurant for an appointment, and while she's waiting
14  for that appointment, she receives notification that the
15  defendant is calling that establishment trying to get an
16  appointment at the same time.  That's when she calls the
17  police, and that's when she obtains the restraining order.

18          And then she learns that this flyer, which I won't
19  -- the Court can read this flyer.  He's distributing this
20  flyer at the town hall, in the parking lot of the school,
21  he's sending it to school officials.

22          And then after he has this come-clean meeting with
23  probation, "I'm going to agree to all of these conditions,
24  I'm going to be totally straight with you, I'm going to
25  admit," he admitted certain things, he was misleading

1 probation the whole time, because he was in another

2 relationship that he knew he had to notify probation about.

3          And then he made after that -- it was subsequent

4 to that that he made these threatening comments to that

5 third individual where he said that he knows former Navy

6 SEALS who know how to do something bad to her ex-husband and

7 make it look like an accident.

8          And you know, I think the threat and the fact that

9 he really can not seem to follow any conditions really

10 renders him dangerous.  He's been given numerous

11 opportunities, and I would submit that particularly given

12 the standard here is clear and convincing evidence and that

13 the burden's on the defendant, that the government certainly

14 feels the defendant should be detained.

15          THE COURT:  Have you done the guideline

16 calculations for this defendant?

17          MS. HEMANI:  As I understand it, is it --

18          Hang on one second.  I want to say it's 8 to 12

19 months.  I don't think I disagree with the calculation that

20 was set forth in defense counsel's --

21          THE COURT:  I think probation --

22          MS. HEMANI:  8 to 14 months.

23          THE COURT:  18 to 24 months?  8 to 14.

24          MS. HEMANI:  8 to 14 months; correct.

25          MS. THOMAS:  Yes.

37

1          THE COURT:  Okay.  All right.  Thank you very

2 much.  I will take it under advisement.

3          THE CLERK:  Court's in recess on this matter.

4      (Court adjourned at 3:37:30 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

```
1                        CERTIFICATION

2         I, Judy Bond, a court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8    _____    July 17, 2017
        Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```